UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JONATHAN VAUGHAN, a/k/a "Ason" | ) | Criminal No.: 22-CR-10076-RGS |
| | ) | |
| Defendant. | ) | |

**OPPOSITION TO MOTION FOR RELIEF FROM PROTECTIVE ORDER**

The United States files this opposition to Defendant's Motion for Relief from Protective Order [D. 74]. Vaughan seeks an amendment to the current Protective Order [D. 30] that governs discovery on this case. Vaughan – who has been trafficking women since at least 2019, who has been convicted of aggravated assault and battery and served years in state prison, who recruited Victim 3 while he was serving this state prison sentence, who was convicted of possession of a loaded firearm and assault and battery with and assault with a dangerous weapon (to wit: a firearm) and served time in jail, who was on probation for the firearm and assault charges when he is alleged to have trafficked and physically and sexually abused Victims 4 and 5, and, as detailed below, who is continuing to recruit women for commercial sex over recorded jail communications while in pretrial custody on the pending charges – claims that there is no good cause to support the Protective Order in this case.

The Defendant's Motion should be denied.

**I.      Procedural Background**

In or about summer 2021, Homeland Security Investigations ("HSI") began investigating the defendant for sex trafficking of women in Boston, Cape Cod and elsewhere. Parallel to this investigation, members of the Boston Police Department ("BPD") arrested the defendant in October 2021 on state charges related to possession of cocaine with intent to distribute and the sex

1

trafficking of Victim 5. *See Commonwealth v. Jonathan Vaughn*, 2102CR2221 (Roxbury Division of the Boston Municipal Court). On or about December 14, 2021, a state district court judge allowed the Commonwealth's Motion for a Protective Order (attached hereto as Exhibit 1), restricting access to and dissemination of identifying information of the victim. The state court judge ordered the Commonwealth to counsel for the defendant over the name of the victim.[1] On or about January 21, 2022, the defendant was arraigned in Suffolk Superior Court on an indictment charging him with the sex trafficking of Victim 5. At the time, the defendant was on probation out of Chelsea District Court and was represented by different attorneys, one on his pending criminal case and one on his pending probation matter. On or about March 26, 2022, the defendant, acting a pro se capacity, drafted a handwritten motion for discovery which contained multiple references to Victim 5's name and phone number (attached hereto as Exhibit 2 in redacted form), provided it to his attorney on the probation matter, who, in turn, provided the filing to the state prosecutor to file for the defendant in Suffolk Superior Court.[2]

Shortly thereafter, the defendant was indicted by a federal grand jury and subsequently arraigned by this Court on three counts of sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1), two counts of transportation of an individual for purposes of prostitution, in violation of 18 U.S.C. § 2421, and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1).

The government produced discovery to prior counsel pursuant to an agreed-upon Protective Order. Initially, prior counsel for the defendant and the government agreed to set a mutually convenient time during which defense counsel could review electronic discovery that containing

---

[1] In section (a) of the motion for a protective order, the Court crossed out "names" but included "contact and identifying information of the civilian witnesses from the defendants' view or access."
[2] Shortly after the state prosecutor obtained a copy of the defendant's pro se filing, his Facebook profile was no longer available for viewing by the public.

extensive personal identifying information of victims and witnesses and explicit photographs and videos of the same. Recognizing the nature of the electronic discovery and mindful of the impossibilities posed by redacting electronic evidence, the government and prior counsel later agreed that the government would produce a copy of these materials to defense counsel in its native format, even with the explicit photographs and content information contained therein. To the extent that the defendant now challenges the Protective Order, the government agrees that some material can be produced to the defendant directly in jail; however, will make such production pursuant to the policies and procedures of the United States Marshals Services.[3] These items include various records of the defendant obtained via subpoenas.

For the reasons detailed below, however, there are a few broad categories of discovery that the defendant should not have in printed or even electronic form, in his own possession while in pretrial custody. Those items include: 1) the forensic results of the search warrant on devices seized from the defendant containing videos, photographs, and of import – personal identifying information of victims and witnesses of charged conduct and conduct under investigation; 2) the 8,500 page printout and 965+ media files from the search warrant execution on his Facebook account (which as described below, is accessed by and in control of a third-party who appears to be acting at the defendant's direction); 3) the videos, nude, semi-nude photographs of victims and sex advertisements depicting the same; 4) the forensic results of the search warrants and consensual searches of devices on the cell phones of the victims; and 5) the warrant affidavits and reports containing victim statements.

---

[3] The government understands that discovery, such as line sheets and audio recordings from wiretaps, is typically provided to USMS on a disc which the defendants in USMS custody can view in a controlled and secure environment and that such evidence cannot be printed and maintained in the jail cell.

II.     **The Facts Support the Protective Order Entered in this Case.**

**A.  Information Previously Provided in Support of Protective Order**

The government submits that there is significant information already before the Court that provides a sufficient basis and good cause to enter (and/or keep in place) the Protective Order in this case. The government incorporates by reference its prior filings in connection with the Motion for Detention (D. 14), including the Affidavit of HSI Special Agent Zachary Mitlitsky in Support of the Motion for Detention (D. 14-1) ("Detention Affidavit"). The government also incorporates by reference its Motion for Protective Order (D. 28), which was previously assented-to by the defendant both through prior counsel and present counsel. The government negotiated the terms of this Assented-To Protective Order with prior counsel; and, to that extent, the defendant knowingly agreed to its terms. This Court found that good cause existed for the Protective Order.

That good cause, as outlined in the Motion for Protective Order, is also detailed in the Detention Affidavit and other filings related to this investigation. The defendant is alleged to be a long-time violent sex trafficker who recruits vulnerable women – those who are drug addicted, have financial issues, and/or are homeless – in the most vulnerable of places – the streets of Downtown Crossing, the area of Massachusetts Avenue and Melnea Cass Boulevard ("Mass. and Cass"), and on social media. He lures the women in with promises of a better life, financial stability, drugs, and, careers in modeling; posts nude and semi-nude photographs of them on known sex-for-fee websites; forces them to "walk the track" at Broadway in Chelsea or in the area of Mass. and Cass or perform dates in hotels or his Mass. and Cass tent; orders them to not return to him at a hotel or his tent until they meet a quota in a given night; provides them drugs in exchange for commercial sex for a fee at his direction; threatens to take the drugs away if they do

not do as they are told; and, engages in physical and sexual abuse on them. The victims have all expressed fear of the defendant and fear of retribution.

The defendant is not deterred by his past criminal charges. In fact, he recruited the victims tied to the charged conduct while he was serving a state prison sentence for a violent assault or he trafficked the women while on probation for loaded firearm and assault charges. He is alleged to have used the phone number (that he provided to Chelsea District Court's probation department) to post sex advertisements depicting Victims 4 and 5. The defendant perpetually commits crimes of violence and is undeterred by the prison sentences and probationary periods that result from his criminal conduct. On these facts alone, there is significant evidence of that he is willing to commit violence, that he will not abide by court orders if he is allowed unfettered access to victim information, and that he continues to pose a risk to public safety and to the victims of and witnesses to the charged conduct.

### B. Additional Information on Vaughan

Shortly after the defendant was arrested on the state sex trafficking charges, the defendant placed a series of recorded calls from jail that are particularly relevant to show why the defendant should not receive hard copy materials of the discovery in this case. These recorded calls and texts are outlined in the attached August 18, 2023 Report of Investigation ("ROI") of Zachary Mitlitsky (filed under seal as Exhibit 3).[4] The report highlights three different categories of concerning conduct engaged in by the defendant while incarcerated.

The first category shows the defendant's obsession about obtaining phone numbers and contact information for women. The defendant placed calls to a male who appears to be his brother, during which it was apparent that the defendant's brother had access to another cellular phone of

---

[4] To the extent the Court wishes to review the calls and text communications referenced in the government's opposition and the attached ROI, the government can make a copy available to the Court.

the defendant's. During these calls, the defendant requested and obtained phone numbers for at least a dozen named females, some of whom are known to investigators as women allegedly trafficked by the defendant. The defendant exclaimed in the call "I am so happy I can even get these numbers." The defendant placed calls to many of these women. Jail call logs reflect that the defendant placed an (unanswered) call to a phone number of one victim of charged conduct while he was in custody on the pending state charges. In a recorded call to yet another man, the defendant claimed that the government is interviewing women that the defendant has been "dealing with", is paying them to "tell on him", and knows this is occurring because he spoke with one woman who spoke with investigators.

Second, the defendant contacted his brother and requested that his brother log onto his Facebook page and message women on his behalf. In fact, through records obtained from Victim 4's phone, the defendant's Facebook profile messaged Victim 4 to tell her that "Ason is locked up" and that the defendant was "trying to contact [her]." Additionally, the defendant requested that his brother download and send to the defendant in jail explicit videos and photographs of women ("the video of me on the beach with a bitch"; "of the blonde chick"; "of the cat woman").

Perhaps, the most egregious conduct that the defendant has engaged in while in pretrial custody on federal sex trafficking charges are the messages the defendant sent to women in an attempt to recruit and groom them to engage in commercial sex for a fee at his direction. ("I need u reaching out handling ya zaddys bizness and staying committed just the way you are. I def need you to get a phone and put a certain number on it by using a simple mobile phone I got a lot of $$$ calling it so I need you making moves for me and ima put you in every position I can for you to progress in life. I def need you to get a phone and put a certain number on it by using a simple

mobile phone I got a lot of $$$ calling it so I need you making moves for me and ima put you in every position I can for you to progress in life.")

### III.    The Law Supports the Protective Order Entered in this Case

"Rules authorizing discovery … are a matter of legislative grace." *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one…"). The Federal Rules of Criminal Procedure give defendants access to discovery in criminal cases, but the Rules recognize the need to balance various concerns in determining how much discovery to provide and how best to provide it. *See Wardius v. Oregon*, 412 U.S. 470, 474 (1973) ("the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded…."). Importantly, the Rules make clear that "at any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d). Rule 16(d)(1) grants trial courts broad powers to regulate and protect discovery through use of protective and modifying orders where good cause is shown. *See United States v. Bulger*, 283 F.R.D. 46, 52 (D. Mass. 2012) (under Rule 16(d), "good cause provides the basis to enter a protective order"). Good cause ordinarily requires "a particularized, specific showing." *Id*.

Since 1966, when the "good cause" standard was first incorporated into Rule 16(d), there has been a recognition that discovery materials should be restricted or protected when disclosure may impact the safety of individuals or lead to witness intimidation. "Among the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation …" Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1966 Amendments. The 1974 advisory committee notes similarly recognize the "obvious" appropriateness of a protective order "where there is reason to believe that a witness would be

7

subject to physical or economic harm if his identity is revealed." Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1974 Amendments.

Rule 16(d) empowers district courts with broad discretion to determine the scope and terms of a protective order, particularly as it pertains to witness safety. *United States v. Roberts*, 793 F.2d 580, 587, vacated on other grounds, 811 F.2d 257 (4th Cir. 1986) (district court may "limit," "condition," or "absolutely prohibit" the disclosure of discovery materials in criminal cases if doing so is "in the interests of witness security"); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991).

Beyond the Rules providing ample reason to support good cause for a protective order, crime victims have certain statutory rights including the right, "to be reasonably protected from the [defendant] . . . [and] to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a). Those rights should be considered in determining the type and manner in which discovery is disclosed in a particular matter.

At the outset, safety and privacy concerns exist here. The risks in this case are not just theoretical or based on conclusory statements detached from reality, or as the defendant put it: an "imagin[ed]…parade of horribles without establishing any likelihood of the conjured events." (D. 74 at 5). The defendant's alleged actions in the charged conduct, his prior history of violence, his unwillingness to follow court orders, and his desire to contact victims of his conduct for what can only be interpreted as nefarious reasons, suggest that safety concerns and potential for witness tampering are real.

Even if such safety concerns, potential for witness tampering, and threatening behavior did not exist, they do not need to in order to establish good cause for a protective order. Actual threats are not required to obtain a protective order restricting the copying of certain discovery, including

*Jencks* material, or forbidding the possession of such material within a jail cell—though, there *were actual threats* against one of the victims in this case. *See United States v. Mitchell*, 15-CR-00040-JAW-3, 2016 WL 7076991, *2 (D. Me. Dec. 5, 2016) ("The Government need not wait until actual threats are made or carried out in order to obtain an order restricting the copying of *Jencks* Act materials or forbidding the possession of such material within a jail cell. As the district court in [*United States v. Garcia*, 406 F. Supp. 2d 304, 306 (S.D.N.Y. 2005)] commented, "by the time intimidation or retaliation against witnesses has occurred, the damage has been done.").

Furthermore, aside from a concern for the victims' physical safety, there is also a concern and a need to protect their mental and emotional well-being as well as a statutory requirement to safeguard their privacy and dignity. *See* 18 U.S.C. § 3771(a). The affidavits in support of search warrants detailing some victim statements provided to defense counsel outline the worst moments of the victims' lives—instances of sexual assault, details of sexual activity, emotional, sexual and physical abuse by the defendant, and descriptions of their permeating fear of the Defendant. These documents should not be in the Defendant's custody in prison.

Even with their names or other identifying information redacted, the victims' statements to law enforcement tend to identify them and therefore should not be kept and maintained in a prison environment. As the District Court found in *United States v. Mitchell*, "Once copies of testimony or witness statements are handed over to an inmate, there is no telling where they will end up or what use (or misuse) might be made of them." 2016 WL 7076991, *3 (citing *United States v. Leland*, No. 1:03-CR-00033-JAW, 2015 WL 1809663 (D. Me. Apr. 21, 2015) (addressing defendant's dissemination of investigative material to threaten cooperating co-defendant and the discovery of investigative materials during the execution of a search warrant of a private residence)).

At bottom, what should govern this Court's analysis is whether good cause exists to continue with the Protective Order currently in place, and the government contends that such good cause undeniably exists.

## IV.     Similar Protections and Restrictions Were in Place in Similar Prosecutions

The government is mindful that restrictive protective orders make it more difficult to prepare for trial. In recognition of this, the government has begun reviewing discovery already provided to counsel in an effort to ease this burden to determine what discovery, if any, can be sent to the defendant in jail. However, arguments about more difficult trial preparation do not automatically carry the day in such situations and do not necessarily trump the concerns about witness safety, possible retaliation, and obstruction of justice.

The defendant has not identified any court to have concluded that similar restrictions on witness discovery creates an undue burden on defendants or their counsel, or otherwise works a constitutional violation on defendants. To the contrary, courts have concluded that these restrictions are reasonable and necessary in the interest of witness safety. *See United States v. Lewis*, 16-30002-MGM, 2016 WL 778361 (D. Mass. Feb. 26, 2016) (approving a blanket protective order in a sex trafficking case because of vulnerable victims subject to threat of physical injury) and *See United States v. Barbeito*, No. 2:09-CR-222, 2009 WL 3645063, at *1 (S.D. W.Va. Oct. 30, 2009) (finding that any inconvenience to defense counsel in reviewing restricted discovery did not "rise to level that would compromise Defendants' substantive rights."); *United States v. Johnson*, 191 F. Supp. 3d 363, 374 (M.D. Pa. 2016) at *9 ("requiring defendants to review the protected documents in the presence of counsel in no way impairs the effectiveness of their proffered defenses").

That the Defendant wants more time to review these items than defense counsel would like to provide should not be accommodated at the expense of the victims. *See e.g., Mitchell*, 2016 WL 7176991, *3 ("The Court appreciates defense counsel's concern about the cost and inefficiency of his driving six hours to sit in a room while Mr. Mitchell reads the Jencks Act material and compares it to the trial transcripts; however, the Court views the inconvenience and expense of a protective order restricting dissemination of written discovery as one of the unavoidable and necessary costs of a criminal justice system that relies on the cooperation of informants to investigate and prove cases.").

### V.     Copies of Phone and Facebook Extractions are Especially Inappropriate for the Defendant to Have in Jail.

The government notes that the defendant has repeatedly requested, through counsel and through his own pro se filings, access to copies of phone dump(s) seized in this case. the phones seized in this case, including phones of two victims and that of the defendant, contain all kinds of sensitive information that is especially inappropriate for the defendant to access in jail. Likewise, the Facebook extraction and the media files of photographs and videos corresponding to that extraction are also inappropriate.

In today's day and age, the information contained on cell phones and social media accounts is not innocuous but is highly sensitive: phones and social media accounts contain personal information, contact lists, messages with personal contacts, photographs, videos, etc. It is exactly the kind of material that can be exploited by someone with ulterior motives, which is why it is especially inappropriate for the defendant to have in jail. This is even more true given *this* defendant's pattern of conduct to obtain contact information for women and to attempt to contact women (including victims) through third-parties while in jail for sex trafficking. Where, as here, the government is aware that these phone and Facebook "dumps" contain the personal information

of victims and sexually explicit material of victims, the government contends that this information would likely be generally prohibited by correctional institutions and is deemed highly sensitive. None of this material should be floating around in jail.

The defendant's bald assertion that "there is nothing 'impractical' or 'unduly burdensome' about the production of a [sic] such a redacted copy of the discovery; such redacted copies can easily be created with a 'find and replace' search, and experience proves that the government has ample assistants who can perform the task" is nothing short of a fallacy. The defendant did not attempt to meet and confer with the government to seek that the government engage in such redactions. Had the defendant done so, he would have learned that such a redaction is not only entirely impracticable, but it is technologically impossible to redact the material in its native format. Indeed, before producing a copy in discovery, the government did laboriously redact out photographs, vanity and actual names, and unique website IDs in the 8,500 pages produced by Facebook pursuant to a search warrant. However, as described above, the defendant continues to have access to his Facebook account through third parties and has enlisted those third parties to contact victims of charged conduct and conduct still under investigation on his behalf. While the actual identifying information is redacted out of the pages produced in discovery, if the defendant had unfettered access in jail to the Facebook search warrant material, he could easily communicate with the third parties accessing his Facebook page to work backwards to conduct searches to identify and intimidate the victims.

The government is not aware of other prosecutions – let alone sex trafficking prosecutions or prosecutions involving victims – where copies of entire phones and Facebook search warrants have been made available to defendants in jail.

While the Government certainly wants the Defendant to be able to access the discovery so that this case can be resolved in the near term either by plea or trial, that desire must be balanced against the statutory rights and protections that the victims and witnesses are entitled to in this case.  As always, the Government is open to finding a solution that addresses everyone's concerns.  The Government would ask that, to the extent the Court is inclined to grant the motion and modify or vacate the protective order, the Defendant should be ordered to return the materials produced to date to the Government and the Government will produce a more limited collection of essential documents with more fulsome redactions sufficient to protect the privacy interests of the victims and witnesses in this case, regardless of how they are shared or maintained in custody.

Dated:   August 29, 2023                                        Respectfully Submitted,

                                                                JOSHUA S. LEVY
                                                                Acting United States Attorney

                                            By:    /s/ Lindsey E Weinstein
                                                   Assistant United States Attorney
                                                   District of Massachusetts
                                                   1 Courthouse Way
                                                   Boston, MA 02210
                                                   (617) 748-3385

CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                    */s/ Lindsey E. Weinstein*
                                    Lindsey E. Weinstein
                                    Assistant United States Attorney

Date:  August 29, 2023